UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 18-CV-81742-MARRA/MATTHEWMAN

JAMES E. SCOTT,

      Plaintiff, *pro se,*

vs.

INTERNAL REVENUE SERVICE,

      Defendant.

_____/

## OPINION AND ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

**THIS CAUSE** is before the Court upon the Internal Revenue Service's Motion for Summary Judgment [DE 20] and Plaintiff's Cross-Motion for Summary Judgment [DE 25]. The Court has carefully considered the written submissions, including the requested supplemental affidavit, the Amended Vaughn Index,[1] the record, the redacted and withheld pages *in camera*, applicable law, and is otherwise fully advised in the premises.

*Pro se* Plaintiff, James E. Scott ("Scott"), moves for summary judgment on the grounds that Defendant, the Internal Revenue Service ("IRS"), has (1) failed to carry its burden to show that each record withheld from disclosure based on a claim of exemption under the Freedom of Information Act ("FOIA") is within the applicable

---

1 "[A]s a show of good faith, and in an attempt to narrow the issues currently before the Court, the Service has re-released, in part, the pages identified by James Scott in his Sur-Reply. The Service re-released those pages so that the pages at issue in this FOIA action match what has been released by the Service in response to Mark Scott's § 6110 request." DE 57 at 4. The IRS submitted a red-lined version of the Vaughn Index to show what it has re-released. It shows that page 704 has now been withheld only in part as opposed to in full.

statutory description, and (2) failed to carry its burden with respect to the assertion of Exemption 5 that "an agency shall withhold information under this section only if the agency reasonably foresees that disclosure would harm an interest protected by an exemption described in subsection b" of 5 U.S.C. 552(a)(8)(A)(i)(I).

The IRS moves for summary judgment asserting it is entitled to judgment as a matter of law that it has (1) performed an adequate search for records responsive to Scott's FOIA request; and (2) properly withheld records, or portions thereof, under the FOIA exemptions provided in 5 U.S.C. § 552(b).  The Magistrate Judge ordered the IRS to produce a limited *Vaughn*[2] Index as to pages 1-44 and 697-826, having found that the tables on pages 8-11 of the Edelman Declaration did not provide sufficient information regarding the withheld documents.  *See* DE 32, DE 41-2.  This Court subsequently ordered the IRS to produce the redacted and withheld pages for an *in camera* review, and a supplemental affidavit regarding its search.  DE 47, DE 48, DE 51.

**Undisputed Material Facts**

1. On March 29, 2018, Scott submitted a FOIA request for "certain records within the [IRS] Office of Chief Counsel." (Decl. of Aaron B. Edelman, hereinafter "Edelman Decl.", DE 20-3, ¶ 6) The request listed three specific categories of records:

    a.   "Any OCC Code and Subject Matter Directory in effect between 8/1/2013 and 11/19/2013";

---

[2]   A *Vaughn* index lists the documents the agency is withholding along with a detailed justification for the agency's claim.  *See Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973).

b.     "Emails between any of: Timothy L. Jones, Helen M. Hubbard, and/or Lewis Bell regarding a pre-submission conference of any Private Letter Ruling request, between 6/1/2013 and 11/18/2013;"[3] and

c.     "Files regarding PLR 201502008:[4] CASE-MIS information, including all subsystems (e.g., TECHMIS); Form 9718, Case History; Checksheet for Processing Private Letter Rulings (see IRM 32.3.2.3.2.13); Form 9818, Case Processing; Bibliography; Any Requests for Assistance; Any responses to Requests for Assistance; Any communications with other areas of the IRS."

(Edelman Decl. ¶ 6.)

2. On March 30, 2018, Scott's request was assigned to Government Information Specialist Aaron B. Edelman ("Edelman"). (Edelman Decl. ¶ 8.)

3. Because Scott's FOIA request sought records related to a Private Letter Ruling ("PLR"),[5] Edelman knew that the records sought by Scott would be stored within

---

3  Pursuant to a telephone call between Scott and Edelman on April 9, 2018, Scott agreed to rescope his FOIA request to remove the second category of records from the request.  Following their phone conversation, Scott emailed Edelman his written consent to rescope the request as discussed. Thus, no records responsive to the second category of Scott's request were searched for or provided to him. Edelman Decl. n.1.

4  In his response to the IRS's Statement of Undisputed Material Facts, Scott asserts that the Edelman Declaration's use of a colon after "Files regarding PLR 201502008" that does not appear in the request materially alters the intent of the original request.  DE 40 at 1."  However, Scott concedes that the request "was apparently understood (mostly) as expansive rather than limited, as material deemed to be responsive . . . included far more than merely the exact line items listed below that general description."  DE 45 at 4-5.

5  The final PLR at issue in this case was dated May 21, 2014 and released on January 9, 2015.  *See* Private Letter Ruling, PLR 201502008, 2015 WL 132757.  ("This letter is in response to your request for a ruling that (1) the extension of the Total Return Swap (TRS) described herein will be not be an abusive arbitrage device within the meaning of § 1.148-10(a) and (2) the TRS described herein will not be integrated with the Bonds under the authority of the Commissioner in § 1.148-10(e).")

the IRS Office of Chief Counsel. (Edelman Decl. ¶ 15.)

4.  Records relating to most PLRs are stored in the Office of Chief Counsel's National Office ("National Office"), which is responsible for issuing most PLRs.  (*Id.*)

5.  While the IRS's Tax Exempt and Government Entities Division also has authority to issue PLRs on certain matters, those matters are not relevant here. (*Id.* n.4).

6.  On April 4, 2018, Edelman prepared and sent a search memorandum requesting a search of potentially responsive records to the Disclosure and Litigation Support ("DLS") Branch within the Office of the Chief Counsel, which is responsible for processing and coordinating all FOIA requests for National Office records. (Edelman Decl. ¶ 16.)

7.  Upon receipt of the search memorandum, DLS Branch Chief Melva Tyler assigned the FOIA request to Ms. Poole ("Poole") for processing. (*Id.* ¶ 17(a).)

8.  In his Declaration, Edelman then proceeds to describe the actions Poole took[6] to fulfill the FOIA requests as follows:  Poole then reviewed the request and confirmed that the records being sought were National Office records.  (*Id.*)

9.  On or around April 5, 2018, Poole contacted the Office of Chief Counsel Library concerning the request for "[a]ny OCC Code and Subject Matter Directory in effect between 8/1/2013 and 11/19/2013" because she knew that the Library had access

---

[6] Scott objected to Edelman declaring the actions Poole took as hearsay.  Because, among other reasons, the declaration did not specifically state that the agency conducted a search reasonably calculated to uncover all relevant documents, the Court ordered the IRS to supplement the record with an affidavit from the person who actually conducted the search.  The Court requested that the person attest to the completeness of the files that were searched, if there were other reasonable places that could have been searched, whether everything that was responsive to the request was produced, and whether, to the best of the person's knowledge, any records were missing.  DE 51.  Pursuant to this request, Poole submitted a declaration, discussed *infra*.

to historic versions of the Office of Chief Counsel's code and subject matter directories. (*Id.* ¶¶ 6,(a), 17(b).)

10. Reference Librarian Dawn Bohls emailed Poole copies of the requested directories. (*Id.*)

11. On April 6, 2018, Poole began her search for the third category of records: "[fi]les regarding PLR 201502008." (*Id.* ¶ 17(c).)

12. Poole began her search using the Office of Chief Counsel's case management information system ("CASE-MIS"). (*Id.*)

13. CASE-MIS and its subsystems are an electronic case management system that are used, among other purposes, to track cases within the Office of Chief Counsel. (*Id.*)

14. All cases, including PLRs, are assigned a case number in CASE-MIS. (*Id.*)

15. Because the third category of records pertained to PLR files, CASE-MIS was the appropriate system to search for responsive records and to determine the location of responsive records. (*Id.*)

16. Poole searched CASE-MIS for "201502008." (*Id.* ¶ 17(d).)

17. CASE-MIS indicated that 201502008 was a written determination number that corresponded to case number PLR-147816-13. (*Id.*)

18. CASE-MIS further indicated that the file for PLR-147816-13 was closed. (*Id.* ¶ 17(e).)

19. Records maintained in closed legal files are generally stored in the Docket, Records and User Fee ("DRU") branch within the Office of Chief Counsel. (*Id.*)

20. CASE-MIS indicated that the PLR-147816-13 filed was checked out of DRU's file

room at that time to an Office of Chief Counsel attorney. (*Id.*)

21. On April 6, 2018, Poole contacted that Office of Chief Counsel attorney and requested access to the file. (*Id.*)

22. On April 9, 2018, that attorney returned the PLR-147816 file to DRU, and Poole checked out the file. (*Id.*)

23. On April 9, 2018, Poole contacted Edelman to confirm that DLS was in possession of the records responsive to the FOIA request. (*Id.* ¶ 18.)

24. On April 19, 2018, Poole emailed Edelman a search response memorandum on behalf of the Office of Chief Counsel. (*Id.* ¶ 19.)

25. The search response memorandum included the Office of Chief Counsel's disclosure recommendations for the responsive records. (*Id.*)

26. Edelman declared he was not aware of any other custodian or location likely to maintain records responsive to Scott's FOIA request. (*Id.* ¶ 20.)

27. Upon completion of the search for records, Edelman personally reviewed the documents and stated in his declaration that he attempted to release every reasonably segregable non-exempt portion of every responsive document. (*Id.* ¶ 5.)

28. The IRS found a total of 826 pages of records that were responsive to Scott's FOIA request. (*Id.* ¶ 12.)  Of these pages, the IRS initially released 660 pages in full and 36 pages in part.  The IRS withheld 47 pages in part[7] and 130 pages in whole.[8]

---

7 *See* DE 48 (under seal) at pages 1-13, 15, 21-25, 27, 28, 30, 35-36, 38-39, 41, 141, 147, 151, 467, 473, 477, and 697.
8 S*ee* DE 48 (under seal) at pages 697-826.

(*Id.*)

29.   The IRS claimed the right to withhold pages of the responsive records pursuant to

FOIA Exemption 3 in conjunction with 26 U.S.C. § 6103(a), FOIA Exemption 5 in

conjunction with the deliberative process privilege, and FOIA Exemption 6. (*Id.* ¶

21.)

**The FOIA and Summary Judgment Generally**

"The purpose of FOIA is to encourage public disclosure of information so

citizens may understand what their government is doing." *Office of Capital Collateral

Counsel, N. Region of Fla. ex rel. Mordenti v. U.S. Dep't of Justice*, 331 F.3d 799, 802

(11th Cir. 2003) ("*Capital Collateral Counsel*").  "Congress enacted FOIA to 'enable the

public to have access to government information that is unnecessarily shielded from

public view.'" *Miccosukee Tribe of Indians of Fla. v. U.S.*, 516 F.3d 1235, 1244 (11th

Cir. 2008) ("*Miccosukee Tribe*") (quoting *Nadler v. U.S. Dep't of Justice*, 955 F.2d

1479, 1484 (11th Cir. 1992)).  Accordingly, "the records at issue . . . are presumed to

be subject to disclosure unless" Defendant "affirmatively establishes . . . the

requested records fall into one of FOIA's exemptions." *Capital Collateral Counsel*,

331 F.3d at 802 (alterations added; citation omitted); *see also Light v. U.S. Dep't of

Justice*, 968 F. Supp. 2d 11, 26 (D.D.C. 2013) ("It is clear that 'disclosure, not secrecy,

is the dominant objective of the [FOIA].'" (alteration added; citation omitted)).

A court reviews an agency's response to a FOIA request *de novo*, 5 U.S.C. §

552(a)(4)(B), and FOIA cases typically and appropriately are decided on motions for

summary judgment.  *Kissinger v. Reporters Comm. for Freedom of the Press,* 445 U.S.

136, 139 (1980).  Courts will grant summary judgment if the movant shows that there

is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a).  More specifically, in a FOIA action to compel production of agency records, the agency "is entitled to summary judgment if no material facts are in dispute and if it demonstrates 'that each document that falls within the class requested either has been produced ... or is wholly exempt from the [FOIA's] inspection requirements.'"  *Students Against Genocide v. U.S. Dep't of State*, 257 F.3d 828, 833 (D.C. Cir. 2001) (quoting *Goland v. CIA*, 607 F.2d 339, 352 (D.C. Cir. 1978)).  "To successfully challenge an agency's showing that it complied with the FOIA, the plaintiff must come forward with 'specific facts' demonstrating that there is a genuine issue with respect to whether the agency has improperly withheld extant agency records."  *Span v. U.S. Dep't of Justice,* 696 F. Supp. 2d 113, 119 (D.D.C. 2010) (quoting *U.S. Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 142 (1989)).

Summary judgment in a FOIA case may be based solely on information provided in an agency's supporting affidavits or declarations if they are "relatively detailed and nonconclusory," *SafeCard Servs., Inc. v. SEC,* 926 F.2d 1197, 1200 (D.C. Cir. 1991) (internal quotations and citations omitted), and when they:

> describe the documents and the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record [or] by evidence of agency bad faith.

*Military Audit Project v. Casey,* 656 F.2d 724, 738 (D.C. Cir. 1981); *see Beltranena v. Clinton*, 770 F. Supp. 2d 175, 181–82 (D.D.C. 2011).  In determining whether the defendant agency has met its burden in support of non-production, "the underlying facts are viewed in the light most favorable to the [FOIA] requester."  *Weisberg v.*

*U.S. Dep't of Justice*, 705 F.2d 1344, 1350 (D.C. Cir. 1983).  In assessing the evidence, courts must determine whether the agency had an "adequate factual basis" for invoking the exemptions.  *Miccosukee Tribe*, 516 F.3d at 1244.  "[I]n this Circuit, an adequate factual basis may be established, depending on the circumstances of the case, through affidavits, a *Vaughn* Index, *in camera* review, or through a combination of these methods."  *Id.* at 1258.

## Discussion

"The Freedom of Information Act codified 'a strong public policy in favor of public access to information in the possession of federal agencies.'"  *Broward Bulldog, Inc. v. U.S. Dep't of Justice*, 939 F.3d 1164, 1175 (11th Cir. 2019) ("*Broward Bulldog*") quoting *News-Press v. U.S. Dep't of Homeland Sec.*, 489 F.3d 1173, 1190 (11th Cir. 2007) (citation and internal quotation marks omitted).  The Act requires that "each agency, upon any request for records which (i) reasonably describes such records and (ii) is made in accordance with published rules ..., shall make the records promptly available to any person."  5 U.S.C. §  552(a)(3)(A).

After an agency receives a request for records, it may withhold information from responsive documents only if it falls within one of nine statutory exemptions.  *See Milner v. Dep't of Navy,* 562 U.S. 562, 565 (2011).  Because "[t]he purpose of [the Act] is to encourage public disclosure of information," responsive documents "are presumed to be subject to disclosure unless [an agency] affirmatively establishes that the requested records fall into one of [the] exemptions."  *Capital Collateral Counsel*, 331 F.3d at 802.  But the Act also "expressly recognizes that important interests are served by its exemptions, and those exemptions are as much a part of [the Act's]

purposes and policies as [its] disclosure requirement." *Food Mktg. Inst. v. Argus Leader Media*, – U.S. –, 139 S. Ct. 2356, 2366 (2019) (internal quotation marks omitted).

At the outset, the Court reviews whether the agency has shown "beyond a material doubt" that it "conducted a search reasonably calculated to uncover all relevant documents." *Miccosukee Tribe*, 516 F.3d at 1248 (quoting *Ray v. U.S. Dep't of Justice*, 908 F.2d 1549, 1558 (11th Cir. 1990), *rev'd on other grounds* 502 U.S. 164 (1991) ("*Ray*"). Next, having reviewed the withheld documents *in camera*, the Court analyzes whether the contested documents are properly withheld under the exemptions asserted and that all reasonably segregable portions have been disclosed.

## I.    Adequate Search

To establish the adequacy of a search for responsive documents, a government agency "must show beyond a material doubt ... that it has conducted a search reasonably calculated to uncover all relevant documents." *Miccosukee Tribe*, 516 F.3d at 1248 (alteration in original) (citation and internal quotation marks omitted). The agency "may meet this burden by producing affidavits of responsible officials 'so long as the affidavits are relatively detailed, nonconclusory, and submitted in good faith.'"[9] *Ray*, 908 F.2d at 1558 (quoting *Miller v. U.S. Dep't of State*, 779 F.2d 1378, 1383 (8th Cir. 1985) ("*Miller*")). If the agency satisfies this burden, "then the burden shifts to the requester to rebut the agency's evidence by showing that the search was

---

[9] Agency affidavits are accorded a presumption of good faith. *Del Rio v. Miami Field Office of Fed. Bureau of Investigations*, No. 08-21103, 2009 WL 2762698, at *6 (S.D. Fla. Aug. 27, 2009) citing *Florida Immigrant Advocacy Ctr. v. Nat'l Sec. Agency*, 380 F. Supp. 2d 1332, 1343 (S.D. Fla. 2005).

not reasonable or was not conducted in good faith." *Id.; see also Karantsalis v. U.S. Dep't of Justice*, 635 F.3d 497, 500–01 (11th Cir. 2011).

Because "[t]he standard is one of reasonableness," the Act "does not require an agency to exhaust all files which conceivably could contain relevant information." *Ray*, 908 F.2d at 1558–59. So a requester cannot rebut a showing of an adequate search by arguing that he received only a subset of the documents that he thought existed. *See Id.* at 1559 ("The plaintiffs' emphasis o[n] a particular reference to 582 interviews, while they received information regarding only 384 interviews, is not enough to rebut the government's showing of an adequate search."). The agency "is not required ... to account for documents which the requester has in some way identified if it has made a diligent search for those documents in the places in which they might be expected to be found." *Id.* (quoting *Miller*, 779 F.2d at 1385) ("[I]t is not necessary to create a document that does not exist in order to satisfy a ... request[er]." (internal quotation marks omitted)).

The IRS asserts it satisfied its burden by submitting the Declaration of Government Information Specialist Edelman that was "relatively detailed, nonconclusory, and submitted in good faith." DE 20-3. In his Declaration, Edelman describes how he commenced the search by sending a search memorandum and a copy of Scott's FOIA request to the DLS branch within the Office of Chief Counsel.[10] DLS is responsible for coordinating all FOIA requests directed to the National Office.[11]

---

[10] Undisputed Material Facts, hereinafter "UMF," ¶¶ 3-4, 6.

[11] UMF ¶ 6. In the Chief Counsel Directives Manual ("CCDM"), all FOIA requests for National Office records are coordinated with DLS. *See* CCDM 30.11.1. The CCDM contains the official policies, procedures, and guidelines of the Office of Chief Counsel. The CCDM is issued as Parts 30-39 of the

Edelman began the search with DLS because the information Scott requested related to a PLR.[12]  Because the National Office is responsible for issuing most PLRs, most of them would be stored in the National Office.[13]

In his role of coordinating the search and collection of responsive records, the IRS Office of Chief Counsel informed Edelman that DLS's search for responsive records was conducted as follows:

a.     Upon receipt of the search memorandum, DLS Branch Chief Melva Tyler assigned the FOIA request to Poole for processing.  Poole reviewed the request and confirmed that the records being sought were National Office records.

b.     On or around April 5, 2018, Poole contacted the Office of Chief Counsel Library regarding the first category of records requested by Scott.[14]  Poole knew that the Library had access to historic versions of the Office of Chief Counsel's code and subject matter directories.  Reference Librarian Dawn Bohls emailed Poole copies of the requested directories.

c.     On April 6, 2018, Poole began her search for the third category of records (files regarding "PLR 201502008")[15] using CASE-MIS.  CASE-MIS

---

IRM, which is publicly available at http://www.irs.gov/irm.

[12]  UMF ¶¶ 4, 6.

[13]  UMF ¶ 4.

[14]  *See* UMF ¶ 1(a):  "Any OCC Code and Subject Matter Directory in effect between 8/1/2013 and 11/19/2013."

[15]  *See* UMF ¶ 1(c):  "Files regarding PLR 201502008: CASE-MIS information, including all subsystems (e.g., TECHMIS); Form 9718, Case History; Checksheet for Processing Private Letter Rulings (see IRM 32.3.2.3.2.13); Form 9818, Case Processing; Bibliography; Any Requests for Assistance; Any responses

and its subsystems are an electronic case management system that are used, among other purposes, to track PLRs within the Office of Chief Counsel.[16]  All cases, including PLRs, are assigned a case number in CASE-MIS.[17]  Because the third category of records pertained to PLR files, CASE-MIS was the appropriate system to search for responsive records and to determine the location of responsive records.[18]

d.    Within CASE-MIS, Poole searched for "201502008".  CASE-MIS indicated that 201502008 was a written determination number that corresponded to case number PLR-147816-13.[19]

e.    CASE-MIS indicated that the file for PLR-147816-13 was closed.  Closed legal files are generally stored in the DRU branch within the Office of Chief Counsel.[20]  CASE-MIS also indicated that the PLR-147816-13 file was checked out of DRU's file room at that time to an Office of Chief Counsel attorney.  On April 6, 2018, Poole contacted the attorney and requested

---

to Requests for Assistance; Any communications with other areas of the IRS".  DE 20-3, ¶ 6(c).

[16]  *See* CCDM 30.7.1, UMF ¶ 13.

[17]  *See* CCDM 30.7.1.2.3 and CCDM 30.9.2.2.3, UMF ¶ 14.

[18]  UMF ¶ 15.

[19]  UMF ¶¶ 16-17.  Written determinations are documents the IRS is required to make available to the public pursuant to the provisions of section 6110 of the Internal Revenue Code ("I.R.C.").  In general, there are three types of written determinations: (1) taxpayer-specific rulings, which include PLRs, (2) technical advice memoranda, and (3) Chief Counsel Advice.  Each written determination is assigned a unique nine-digit number upon publication.  These written publication numbers are different from the case numbers used to track cases in CASE-MIS.

[20]  UMF ¶ 19, *see* CCDM 30.11.1.2.2.

access to the file.[21]  On April 9, 2018, the attorney returned the

PLR-147816-13 file to DRU, and Poole checked out the file.[22]

f.   On April 9, 2018, Poole contacted Edelman to discuss plaintiff's FOIA

request.  Poole confirmed that DLS was in possession of the records

responsive to the first and third categories of the FOIA request.[23]

The IRS asserts that this search was "reasonably calculated to uncover all

relevant records" and Edelman declared that he was "not aware of any other

custodian or location likely to maintain records responsive to Plaintiff's FOIA request."

DE 20-2 at 4; DE 20-3, ¶ 20.

Scott asserts many reasons why the search described above was inadequate,

including that

▸   the details of the search are hearsay, as Edelman has no first-hand knowledge

of the events described;

▸   Edelman did not attest that the search was "reasonably calculated to uncover

all relevant documents." *See Karantsalis v. U.S. Dep't of Justice*, 635 F.3d 497

(11th Cir. 2011).

▸   the file includes drafts of the PLR, but no final version.  *See* CCDM

30.9.2.2.3.3.

▸   the Conference Report of the pre-submission conference is missing.  *See* CCDM

32.3.2.4.3.4.

---

21  UMF ¶ 21.
22  UMF ¶ 22.
23  UMF ¶ 23.

▸ "sticky notes" that were stuck on "something" are either no longer in the current file or were omitted;

▸ there is no indication that the file was checked for completeness on its return to the custodian, as required.  *See* CCDM 1.15.7.2.8.1.3.

▸ there is no statement from the actual custodian of the records or the DLS that the file was complete when it was returned from the attorney who had checked it out.  Scott queries whether the file was complete when it was initially created, and whether it stayed complete based on its chain of custody since it was created.  DE 45 at 4.

▸ Certain background file documents pertaining to PLR 201502008 were released in March 2015, but were not identified to Scott in response to his request, although they clearly met the search criteria.  DE 45 at 5 citing DE 29-2 at 2. Scott argues these "documents originated from the case file at issue, and either still exist within in it . . . or the originals have been moved to another file, in which case their removal from the original file should have been noted."  DE 45 at 5.

▸ Scott states

> "the Edelman Declaration omits mention of an exchange with Plaintiff on or about June 11, 2018, culminating in an email from Mr. Edelman stating that "the answer he received back" (without stating from whom) was that, "The conversations with TEB and Branch 6 referenced in the case history were not of the type referred to as a "request for assistance," but of an informal nature and did not require, or result in, a written response." Plaintiff's SUMF ¶ 58, DE 29-4.  Yet, "delivered page 22" refers to something that "TEB provides", and "delivered page 21" refers to that being "TEBs submission" and directs it to be sent to "the branch that deals [redacted]" (believed to be Branch 6, in

> context). (Plaintiff's SUMF ¶ 56.d; DE 29-3, pp. 5-6).  There is
> nothing included about either the solicitation of input from TEB,
> or the form of the response, or the response of the other branch
> to the email. Even if those documents (the solicitation to TEB and
> the response, and the response from the other branch) were
> omitted from the case file, by highlighting their glaring absence
> during the process it was not reasonable for DLS to fail to search
> beyond the case folder itself.  There is a demonstrated issue of
> incomplete files within DLS and/or DRU ."

DE 45 at 6-7.  Finally, Scott asserts,

> it is extremely suspect that, in 2014, a matter that consumed
> over 100 hours of attorney time (page 1 of the redelivered
> documents) over more than 6 months of elapsed time produced
> only 18 pages of handwritten notes (pp. 697-709 and 817-821)
> and exactly zero typed memos or similar records.

DE 45 at 7.

    As far as Scott's objection that Edelman's Declaration contains hearsay, it has

been held that government declarants who do not physically perform the searches for

responsive records satisfy the requirement of personal knowledge and qualify as

competent witnesses concerning FOIA searches.  The D.C. Circuit has said

> [f]aced with "the most demanding FOIA request ever filed," our circuit
> court long ago recognized the validity of the affidavit of an individual
> who supervised a search for records even though the affiant had not
> conducted the search himself.  *Meeropol v. Meese*, 790 F.2d 942, 951
> (D.C. Cir. 1986).  This precedent was followed in *SafeCard Servs., Inc. v.
> S.E.C.*, 926 F.2d 1197 (D.C. Cir. 1991).  In *SafeCard*, the court noted that
> the affiant was the most appropriate person to provide a comprehensive
> affidavit in FOIA litigation, as he was in charge of coordinating the SEC's
> document search and recovery efforts in response to the plaintiff's FOIA
> request.  *Id*. at 1201.

*Brophy v. U.S. Dep't of Defense*, No. 05-360-CIV, 2006 WL 571901, at *4 (D.D.C. Mar.

8, 2006) ("*Brophy*").

Edelman has formal responsibility for handling FOIA requests within the IRS. Edelman Decl. ¶¶ 1-3.  "Declarations that contain hearsay in recounting searches for documents are generally acceptable."  *Brophy*, 2006 WL 571901, at *4 citing *Kay v. Federal Comnc'ns Comm.*, 976 F.Supp. 23, 34  n.29 (D.D.C. 1997), *aff'd*, 172 F.3d 919 (D.C. Cir. 1998) (Table).  *See also Carney v. U.S. Dep't of Justice*, 19 F.3d 807, 814 (2d Cir. 1994) ("An affidavit from an agency employee responsible for supervising a FOIA search is all that is needed to satisfy Rule 56(e)"); *Barnard v. Dep't of Homeland Sec.*, 598 F. Supp. 2d 1, 19 (D.D.C. 2009) (rejecting plaintiff's argument that declarations contained inadmissible hearsay, because "FOIA declarants may include statements in their affidavits based on information that they have obtained in the course of their official duties").  Accordingly, Scott's objection to Edelman's Declaration because it contains hearsay is rejected.

Next Scott objects that Edelman does not attest that the search was reasonably calculated to uncover all relevant documents.  An agency must establish "beyond a material doubt" that it "conducted a search reasonably calculated to uncover all relevant documents."  *Miccosukee Tribe*, 516 F.3d at 1248 (quoting *Ray v. U.S. Dep't of Justice*, 908 F.2d 1549, 1558 (11th Cir. 1990), *rev'd on other grounds,* 502 U.S. 164 (1991); *Broward Bulldog,* 939 F.3d at 1175.

The Court agreed with Scott that Edelman did not state that the IRS's search was reasonably calculated to uncover all relevant documents, so it ordered

> the IRS to supplement the record with an affidavit from the person who conducted the actual search in this case and have that person attest to the completeness of the files that were searched, if there were other reasonable places that could have been searched, whether everything that was responsive to the request was produced, and whether, to the

best of the person's knowledge, any records are missing.

Order at DE 51 at 1.  The IRS then submitted the Declaration of Deanna Poole ("Poole

Decl."), a Supervisory Legal Administrative Specialist who was assigned to perform

Scott's FOIA request.  DE 52-1.

Beyond repeating everything that Edelman has already stated in his

declaration, Poole declared that she "personally reviewed the entire PLR 147816-13

file.  To the best of my knowledge, the file was complete and no records were missing

from it.  There were no indications that records responsive to the third category

would be stored in other locations."  DE 52-1 ¶ 20.  She also declared, "I am not

aware of any other custodian or location within the Office of Chief Counsel likely to

maintain records responsive to plaintiff's FOIA request."  DE 52-1 ¶ 23.  And that "I

transferred all of the responsive records to Mr. Edelman."  DE 52-1 ¶ 22.

In his sur-reply, Scott complains that Poole

does not offer any procedures that she followed that would support the
representation that the file was complete.  The file that was searched
was a collection of papers assembled by the initiating attorney.  Ms.
Poole has no way to know if that was done thoroughly, if every relevant
record was printed into hard copy and placed in the file.  The only
attestation of completeness that would be meaningful would have to
come from the attorney who assembled the file. . .  To the extent that
emails were missing from the file folder, those emails could be stored on
the computers of individual senders and/or recipients, or on a central
drive for the Office of Chief Counsel.  *See* 'Description of IRS Email
Collection and Production' submitted to the Senate Finance Committee,
pp. 3-4, retrieved from https://www.gop.gov/app/uploads/2014/04/
IRS_WydenHatchResponse.pdf. . .  In a separate FOIA request . . . that
requested emails between the two Office of Chief Counsel attorneys and
the outside attorney for the requester during the period corresponding
to the PLR request, Defendant has admitted to finding 65 pages of
responsive records, although only 1 such email was included in the
records released . . .  Some of the records released to date in this other

> matter correspond to records released in this matter, while others are
> missing from this matter but clearly related.  See Attachment 1.  The
> most likely explanation is that the emails are missing from the case file,
> and that the targeted FOIA request for emails was processed differently
> and consequently found the emails.

DE 53-1 at 5-6.

As far as Scott's argument that the search was inadequate because

emails are missing that were produced in another FOIA request, there are two

reasons why this argument is unpersuasive.  First, Scott did not request emails

in the instant case, and there is no reason to believe that emails were printed

and put in the files that were searched.  Second, evidence of records released

pursuant to a separate FOIA request is not demonstrative of whether a search

was adequate.  *See Hooker v. U.S. Dep't of Health & Human Servs.*, 887 F.

Supp. 2d 40, 52 n.11 (D.D.C. 2012), *aff'd*, No. 13-5280, 2014 WL 3014213 (D.C.

Cir. May 13, 2014) (holding that records released pursuant to a broader FOIA

request not at issue in the litigation had no bearing on whether the agency

conducted a reasonable search for the FOIA request at issue where that search

failed to turn up those records).  This is because the IRS's search for responsive

records is based on the FOIA request itself.  The IRS tailors a specific search

based on each individual FOIA request.  *See Campbell v. U.S. Dep't of Justice,*

164 F.3d 20, 28 (D.C. Cir. 1998), as amended (Mar. 3, 1999) ("FOIA demands

only a reasonable search tailored to the nature of a particular request.").  This

means that the IRS may search different systems using different search terms

for each individual FOIA request.  Because the searches are different, each

search can uncover different records.   Accordingly, it would inappropriate to

measure the adequacy of one search by the results of a completely different search.

In the FOIA request at issue in this litigation, Scott requested "[f]iles regarding PLR 201502008[:] CASE-MIS information, including all subsystems . . . ." However, as indicated by the IRS's response to Scott's other FOIA request attached as Attachment 1 to Scott's Motion, in his other FOIA request, Scott sought "all emails from June 1, 2013 through June 1, 2014 between IRS Counsel Attorneys Timothy Jones and/or Lewis Bell, and J. Hobson Presley, Jr. (aka Hobby Presley) and/or any party at Balch & Bingham." These requests are substantially different and invariably led the IRS to search different systems and use different search terms to find responsive records. *Hooker*, 887 F. Supp. 2d at 52 n.11 ("Though an agency "has a duty to construe a FOIA request liberally," *Nation Magazine v. U.S. Customs Serv.*, 71 F.3d 885, 890 (D.C.Cir. 1995), there is no requirement that the agency interpret a request more broadly "than the description reasonably contained in the request[ ]," *McKinley v. FDIC*, 807 F. Supp. 2d 1, 7 (D.D.C.2011).") Accordingly, it is no surprise that the different searches would turn up different records. The fact that a completely separate search turned up certain records cannot therefore demonstrate that the search at issue in this case was inadequate.

Scott also complains that Poole's Declaration does not make the statement requested by the Court's Order as to whether all responsive documents were produced. While Poole's Declaration does not include that exact statement, her statements quoted above do indicate that Poole delivered

to Edelman all responsive documents and that the search was adequate.

Scott attempts to use the "oft-used but rarely successful strategy of impugning the adequacy of the search by identifying documents that [he] claim[s] would have been produced had the [IRS] proceeded properly." *Leopold v. CIA*, 177 F. Supp. 3d 479, 494 (D.D.C. 2016). It is well-settled law that the fundamental question in the adequacy of the search analysis is not

> whether there might exist any other documents possibly responsive to the request, but rather whether the search for those documents was adequate. The adequacy of the search, in turn, is judged by a standard of reasonableness and depends, not surprisingly, upon the facts of each case. In demonstrating the adequacy of the search, the agency may rely upon reasonably detailed, nonconclusory affidavits submitted in good faith.

*Steinberg v. U.S. Dep't of Justice*, 23 F.3d 548, 551 (D.C. Cir. 1994).

Thus, it is not necessary for a responsive agency to demonstrate that it has unearthed "every single potentially responsive document." *Ethyl Corp. v. EPA*, 25 F.3d 1241, 1246 (4th Cir. 1994); *see also SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1201 (D.C. Cir. 1991) ("When a plaintiff questions the adequacy of the search an agency made in order to satisfy its FOIA request, the factual question it raises is whether the search was reasonably calculated to discover the requested documents, not whether it actually uncovered every document extant.") Rather, the agency need only demonstrate that the search it conducted was reasonably calculated to uncover responsive records. Accordingly, whether there may be more records responsive to Scott's FOIA request is not the key inquiry. *See Bigwood v. Dep't of Def.*, 132 F. Supp. 3d 124, 144 (D.D.C. 2015) ("The fact that [the agency's search] did not ultimately result in the identification of some of the documents plaintiff hoped to

recover does not undermine the reasonableness of its searches . . ."); *see also,*

*DeSilva v. U.S. Dep't of Hous. & Urban Dev.*, 36 F. Supp. 3d 65, 70 (D.D.C. 2014)

("[T]he failure of an agency to turn up one specific document in its search does not

alone render a search inadequate." (internal quotations and citations omitted)).

An agency's FOIA search need not be perfect or exhaustive. *Lee v. U.S.*

*Attorney for S.D. Fla.*, 289 F.App'x 377, 380 (11th Cir. 2008). As stated above, at

summary judgment the IRS "must show beyond material doubt ... that it has

conducted a search reasonably calculated to uncover all relevant documents." *Ray*,

908 F.2d at 1558. As stated, this burden is satisfied if the agency provides affidavits

describing its search that are "relatively detailed, non-conclusory, and submitted in

good faith." *Id.* The affidavits should include what records were searched, who did

the search, and what search terms or processes were used. *Greenberger v. Internal*

*Revenue Service*, 283 F. Supp. 3d 1354, 1366 (N.D. Ga. 2017) citing *Judicial Watch.,*

*Inc. v. Dep't of the Navy,* 971 F. Supp. 2d 1, 2 (D.D.C. 2013); *see also, Safecard*

*Servs., Inc. v. SEC*, 926 F.2d 1197, 1201 (D.C. Cir. 1991) (holding that the employee in

charge of coordinating the search was the most appropriate person to provide a

comprehensive affidavit, and noting the presumption of good faith attributed to

agency affidavits and Vaughn Indexes).

In this case, the IRS's search was reasonably calculated to uncover responsive

records. As set forth in the Edelman and Poole Declarations, the IRS searched the

CASE-MIS system because not only was it the system explicitly identified in Scott's

FOIA request, but because it is also the system used to store records pertaining to PLR

files. Poole Decl. ¶¶ 11-12, DE 52-1; Edelman Decl. ¶ 17, DE 20-3. In both the

Edelman and Poole Declarations, the declarants attest that they are not aware of any other custodians or locations within the Office of Chief Counsel likely to maintain records responsive to Scott's FOIA request.  Poole Decl. ¶ 23; Edelman Decl. ¶ 20.  As such, Scott's assertion that the IRS's search was not reasonably calculated to uncover all relevant documents is rejected.

The above analysis also applies to defeat Scott's objections that (a) the Conference Report of the pre-submission conference is missing; (b) "sticky notes" that were stuck on "something" are either no longer in the current file or were omitted;[24] (c) there is no indication that the file was checked for completeness on its return to the custodian; (d) there is no statement from the actual custodian of the records or the DLS that the file (when it was returned from the attorney who had checked it out) was complete and represented all responsive records; (e) there is no indication the file was complete when it was initially created, and whether it stayed complete based on its chain of custody since it was created; (f) there is a demonstrated issue of incomplete files within DLS and/or DRU; and (g) "it is extremely suspect that, in 2014, a matter that consumed over 100 hours of attorney time . . . over more than 6 months of elapsed time produced only 18 pages of handwritten notes (pp. 697-709 and 817-821) and exactly zero typed memos or similar records."  DE 45 at 7.  *See*

---

24   The Court notes that pursuant to the Vaughn Index, on page 14, a photocopy of an undated "sticky note" with drafting attorney's handwritten notes was released with no exemptions claimed; on page 15, a photocopy of an undated "sticky note" with drafting attorney's handwritten notes was released after the IRS withdrew its prior assertion of Exemption (b)(3) in conjunction with I.R.C. § 6103(a); on pages 16-20, five photocopies of undated "sticky notes" with drafting attorney's handwritten notes was released in full with no exemptions claimed; and on page 42 a photocopy of an undated "sticky note" with drafting attorney's handwritten notes was released in full with no exemptions claimed.  DE 41-2 at 1, 2, 4.

*Safecard Serv.*, 926 F.2d at 1200 (explaining that purely speculative claims about the existence and discoverability of other documents does not rebut the presumption that the search was adequate); *Iturralde v. Comptroller of Currency*, 315 F.3d 311, 315 (D.C. Cir. 2003) ("it is long settled that the failure of an agency to turn up one specific document in its search does not alone render a search inadequate"); *Morley v. Cent. Intelligence Agency*, 508 F.3d 1108, 1120 (D.C. Cir. 2007) (same).

Finally, Scott asserts that certain background file documents pertaining to PLR 201502008 were previously released in March 2015, but were not identified to Scott in response to his request in this case although they clearly met the search criteria. DE 45 at 5 citing DE 29-2 at 2. Scott argues these "documents originated from the case file at issue, and either still exist within in it . . . or the originals have been moved to another file, in which case their removal from the original file should have been noted." DE 45 at 5. He also states the file includes drafts of the PLR, but no final version. In his sur-reply, Scott asserts

> In the other parallel FOIA case currently before this Court, 18-cv-81750, Defendant filed a Third Declaration of Andrew Keaton on March 20, 2020. Therein, Keaton stated that, "[b]ecause PLR files do not necessarily contain all communications pertaining to the PLR from all employees, I reasoned that additional records of such communications may exist outside of the PLR files. Therefore, in order to ensure that the IRS located all records responsive to plaintiff's request, I determined that a supplemental search was necessary." Clearly, Poole's statements and Keaton's statements cannot both be true, given that each also claim "knowledge of the types of documents created and maintained by the various divisions and functions of the IRS Office of Chief Counsel." DE 52-112; 18-cv-81750 DE 27-512.

DE 56 at 3.

Section 6110 of the Internal Revenue Code provides generally that "[e]xcept as otherwise provided in this section, the text of any written determination and any background file document relating to such written determination shall be open to public inspection at such place as the Secretary may by regulations prescribe."  26 U.S.C § 6110(a).  Section 6110 establishes a comprehensive scheme for resolution of disputes relating to disclosure of such documents.  *See* 26 U.S.C. § 6110(f).  This scheme is the exclusive remedy for persons aggrieved by the IRS's compliance with § 6110's mandate.  26 U.S.C. § 6110(m); *see also Church of Scientology of Calif. v. Internal Revenue Svc.*, 792 F.2d 146, 149 (D.C. Cir. 1986) (noting that § 6110 supplants FOIA for documents covered by that section); *Conway v. United States Internal Revenue Svc.*, 447 F. Supp. 1128, 1131 (D.D.C. 1978) (finding that the legislative history of § 6110 demonstrates that Congress intended for it to replace FOIA).

A motion for summary judgment based on noncompliance with the FOIA is not, therefore, the proper vehicle for objections related to the failure to receive a PLR and its background files.  *Fruehauf Corp. v. IRS*, 566 F.2d 574, 577 (6th Cir. 1977) ("With respect to these particular documents, Congress intended that § 6110 provide the exclusive means of public access, ruling out resort to the regular FOIA procedures."); *see also Highland Capital Mgmt, LP v. IRS*, No. 3:17-cv-2906-G, 2019 WL 1227782, at *8 (N.D. Tex. Mar. 15, 2019) (holding that § 6110, and not the FOIA, is the exclusive remedy for disclosure of written determinations); *Long v. U.S. Internal Revenue Svc.*, 742 F.2d 1173, 1178 (9th Cir. 1984) ("Congress, wishing to exclude section 6110 from FOIA, specifically made known its intention by providing that

section 6110 was to be the exclusive remedy where disclosure of written determinations were sought and that the rules and procedure of FOIA would not apply.").

The fact that the IRS did not release the PLR and any background file documents related to that PLR cannot demonstrate that the IRS's search was deficient. To be clear, at issue in this litigation is Scott's FOIA request, and not any previous request he has made under Section 6110. If Scott seeks to challenge the IRS's release of records under Section 6110, there is a separate mechanism for him to do so. Despite Scott's attempts to argue otherwise, it is not relevant to this suit what documents the IRS released under Section 6110, whether the IRS followed the proper procedure in releasing those records under Section 6110, and whether the IRS released all applicable records under Section 6110.

Scott has failed to rebut any facts material to whether the IRS's search was reasonable. Scott's argument that the IRS's search was insufficient because it failed to identify information that had previously been disclosed pursuant to Section 6110 is rejected. The IRS is therefore entitled to judgment in its favor as to whether it conducted a reasonable search.

## II.   **Withheld Pages**

A district court has jurisdiction in a FOIA action "to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant." 5 U.S.C. § 552(a)(4)(B). Under FOIA, records are "presume[d to be] subject to disclosure." *Ely v. Fed. Bureau of Investigation*, 781 F.2d 1487, 1490 (11th Cir. 1986). The government agency resisting

disclosure thus carries the burden of rebutting this presumption.  *Id.* ("FOIA places on the courts the obligation to consider and resolve competing claims of privilege and access, relegating the government to the role of furnishing evidence to rebut the presumption of disclosure."); *see also, Miccosukee Tribe*, 516 F.3d at 1258 (agency has the burden of proving that it properly invoked any FOIA exemptions when it decided to withhold information).

When reviewing the denial of a FOIA request, a trial court engages in a "two-step inquiry: the court must determine that (1) the information was of the sort covered by the relevant exception and then undertake (2) a balancing of individual privacy interests against the public interest in disclosure that may reveal that disclosure of the information constitutes a clearly unwarranted invasion of privacy." *Ely*, 781 F.2d at 1490, n.3 (internal quotations and alterations omitted).

To justify withholding a record, an agency may rely on reasonably detailed affidavits describing the documents and facts sufficient to establish an exemption. *EPA v. Mink*, 410 U.S. 73, 89 (1973); *Jeanty v. FBI,* No. 13-20776-CIV, 2014 WL 206700, at *3 (S.D. Fla. Aug. 25, 2014).  An agency need not provide such detail about the information withheld so as to defeat the purpose of asserting the exemption.  *Iglesias v. CIA*, 525 F. Supp. 547, 553 (D.D.C. 1981).

In this case, the IRS located a total of 826 pages of responsive documents. The IRS initially released 660 pages in full, 36 pages in part, and withheld 47 pages in part[25] and 130 pages in whole.[26]  The records are being withheld pursuant to FOIA

---

25  *See* DE 48 (under seal) at pages 1-13, 15, 21-25, 27, 28, 30, 35-36, 38-39, 41, 141, 147, 151, 467, 473, 477, and 697.
26  S*ee* DE 48 (under seal) at pages 697-826.

Exemption 6 (personnel and medical files), FOIA Exemption 3 in conjunction with 26 U.S.C. § 6103 (tax returns and return information), and FOIA Exemption 5 in conjunction with the deliberative process privilege.  5 U.S.C. § 552(b)(6).

A.     **Pages Withheld in Part Pursuant to FOIA Exemption 6**

Exemption 6 permits an agency to withhold "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(6).  The phrase "similar files" has a broad meaning and includes any detailed government records on an individual that can be identified as applying to that individual.  *News-Press v. U.S. Dep't of Homeland Sec.*, 489 F.3d 1173, 1197 (11th Cir. 2007).

Citizens are generally not required to explain why they seek information through FOIA requests.  "When disclosure touches upon certain areas," however, such as the privacy concerns of Exemption 6, the requester must show (1) "that the public interest sought to be advanced is a significant one," that is, "an interest more specific than having the information for its own sake," and (2) that "the information is likely to advance that interest."  *National Archives & Records Admin. v. Favish*, 541 U.S. 157, 172 (2004).

A reviewing court must "balance the individual's right of privacy against the basic policy of opening agency action to the light of public scrutiny."  *Capital Collateral Counsel,* 331 F.3d at 802.  The Eleventh Circuit has held that the agency's burden under Exemption 6 of showing that disclosure would constitute a clearly unwarranted invasion of personal privacy is an onerous one.  *News-Press*, 489 F.3d at 1198.  Additionally, Congress has expressed the core purpose of the FOIA as

"contribut[ing] significantly to public understanding of the operations or activities of the government." *U.S. Dep't of Justice v. Reporters Committee for Freedom of Press*, 489 U.S. 749, 775–76 (1989) ("*Reporters Committee*").

The IRS withheld eleven pages in part under FOIA Exemption 6.  The withheld information is located on pages 21-24,[27] 141, 147, 151, 467, 473, 477, and 697.[28]  The IRS claims the information withheld on these pages contains personal information about individuals other than Scott, the disclosure of which could reasonably be expected to constitute an unwarranted invasion of privacy and, there is no countervailing public interest in this information.  The Court has reviewed the redacted information *in camera* and agrees.

Scott objects to the IRS's use of this exemption asserting that the IRS previously made the information public (DE 40, ¶ 50), and that in stating its burden under Exemption 6, it omitted the words "a clearly" between the words constitute and unwarranted (DE 40, ¶ 46).  The Court finds the missing word to be a harmless oversight, as the Court has properly set forth and is applying the correct IRS burden. The Court has also compared the information withheld and the pages Scott claims were previously released, and they are not the same.  DE 29-3, Ex. 3 (at 12-13).

---

[27] *See* DE 48 (under seal).  Scott is not challenging the IRS's withholding of information located on pages 21 through 24 (emails between Office of Chief Counsel attorneys containing discussions of personal health and family matters unrelated to their work and conference line dial-in numbers and access codes) pursuant to FOIA Exemption 6.  DE 45 at 7.  Information withheld pursuant to Exemption 5 on pages 21 and 22 are discussed *infra*.

[28] Certain information on page 697 is being withheld under FOIA Exemption 6, while other parts of the page are being withheld pursuant to Exemption 5 in conjunction with the deliberative process privilege and Exemption 3 in conjunction with 26 U.S.C. § 6103.  These other claimed exemptions are addressed *infra*.

Specifically, the IRS claims the withheld information includes emails between Office of Chief Counsel attorneys discussing personal health and family matters, conference line dial-in numbers and access codes, names and telephone numbers of IRS employees who are working in sensitive positions, and handwritten notes containing the personal telephone numbers of individuals other than Scott. The IRS claims it has withheld in full only those records that fell within a FOIA exemption, or those pages wherein the portions exempt from disclosure under the FOIA were so inextricably intertwined with nonexempt material as to be non-segregable.

The handwritten notes on page 697 contain the personal telephone numbers of individuals other than the plaintiff. The IRS withheld, in part, information on pages 141, 147, 151, 467, 473, and 477 that contain the name and telephone number of an employee the IRS states is currently working in a sensitive position. As stated above, Exemption 6 provides that the disclosure requirements of FOIA "do not apply to matters that are — (6) personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). The threshold issue thus, is whether a privacy interest is served by withholding the employee's name. *Painting & Drywall Work Preservation Fund v. HUD*, 936 F.2d 1300, 1302 (D.C. Cir. 1991). Once the privacy interest at stake is determined, the next issue is whether the public interest would be advanced by disclosing the information.

The United States Supreme Court defines an individual's privacy as including the "information concerning his or her person." *Id.*, citing *Reporters Committee*, 489 U.S. at 763. Scott argues that because this information is publicly available, FOIA

Exemption 6 no longer applies. *Hall v. U.S. Dep't of Justice,* 552 F. Supp. 2d 23, 30–31 (D.D.C. 2008) ("The FOIA exemptions do not apply once the information is in the public domain.").

A privacy interest does not disappear merely because a person's name may be discovered through different means or because their name may have been previously disclosed when they were working in non-sensitive positions. *See Lawrence v. IRS*, 355 F. Supp. 2d 1307, 1311 (M.D. Fla. 2004) (holding that the public domain doctrine did "not operate on information pertaining to a time period later than the date of the publicly documented information"); *see also Neary v. Fed. Deposit Ins. Corp.*, 104 F. Supp. 3d 52, 60 (D.D.C. 2015) ("[A]n individual's privacy interest in limiting disclosure or dissemination of information does not disappear just because it was once publicly released.").

Moreover, the fact that some of the information may exist in the public domain does not necessarily mean that the claimed exemption can no longer serve its purpose. *Department of Def. v. Fed. Labor Relations Auth.*, 510 U.S. 487, 500 (1994) ("[a]n individual's interest in controlling the dissemination of information regarding personal matters does not dissolve simply because that information may be available to the public in some form"); *Lazaridis v. Dep't of State*, 934 F. Supp. 2d 21, 35-36 (D.D.C. 2013) ("the fact that information exists in some form in the public domain does not necessarily mean that official disclosure will not cause harm cognizable under a FOIA exemption") (quotation omitted); *Fitzgibbon v. CIA*, 911 F.2d 755, 766 (D.C. Cir. 1990) ("[W]e have unequivocally recognized that the fact that information resides in the public domain does not eliminate the possibility that further disclosure

can cause harm . . . .").

Rather, the burden is on the plaintiff to demonstrate that there is specific information in the public domain that duplicates the requested information. *NYC Apparel FZE v. U.S. Customs & Border Prot.*, 484 F. Supp. 2d 77, 89–90 (D.D.C. 2007) (explaining that for the public domain doctrine to apply, the plaintiff must "point to specific information in the public domain that appears to duplicate that being withheld"); *Bartko v. U.S. Dep't of Justice*, 167 F. Supp. 3d 55, 71 (D.D.C. 2016) (a plaintiff must show that the information requested is as specific as the information previously released, that it matches that information, and that it has already been made public through an official and documented disclosure). "In particular, Plaintiff must "point[ ] to specific information in the public domain that appears to duplicate that being withheld.'" *Id.*

To meet his burden to show that the information has been previously released, Scott relies on Exhibit 3 to his Declaration (DE 29-3) at pages 12-13. *See* DE 40, ¶¶ 56.g and 56.h. The Court compared the information withheld and the pages Scott claims demonstrates that the information was previously released, and Scott's document does not reveal the information the IRS is seeking to protect.

In weighing the strong presumption in favor of disclosure against individuals' right of privacy, the Court finds that disclosure would not likely advance a significant public interest. *National Archives & Records Admin. v. Favish*, 541 U.S. 157, 172 (2004). The Court has reviewed the redacted pages *in camera* and determined that disclosure would result in the "unnecessary disclosure of personal information." *James E. Scott v. Treasury Inspector Gen. for Tax Admin.*, No. 19-10653, – F.App'x –,

2019 WL 4893924, at *2 (11th Cir. 2019) citing *New-Press*, 489 F.3d at 1198.  Public interest in disclosure does not outweigh the invasion of privacy effected by the disclosure of the employee's name or the personal telephone numbers of individuals other than the plaintiff.  The disclosure of this information is properly excluded pursuant to Exemption 6 as its release could lead to harassment, embarrassment, or other unwarranted invasions of personal privacy.  *Electronic Frontier Foundation v. U.S. Dep't of Justice,* 384 F. Supp. 3d 1, 15 (D.D.C. 2019).

**B.  FOIA Exemption 3 in Conjunction with 26 U.S.C. § 6103.**

The IRS withheld 36 pages in part and 130 pages in full under 5 U.S.C. § 552(b)(3) ("Exemption 3")[29] and 26 U.S.C. § 6103(a).[30]  (Edelman Decl. ¶¶ 24, 28(b).) The information withheld in part is located on pages 1-13, 15, 25, 27, 28, 30, 35-36, 38-39, and 41, and the pages withheld in full are pages 697-826.  *See* DE 48 (under seal).  The IRS states the records withheld in full and in part consist of tax return information related to third parties.  "Specifically, this information includes taxpayers' names, identification numbers, and other information collected or prepared by the IRS with respect to the determination of their potential or actual tax liability."  DE 20-2 at 7.

Scott does not challenge the redactions of taxpayer name, representative name, or Taxpayer Identification Number based on Exemption 3 in conjunction with § 6103(a) on pages 1-13, 15, 25, 27, 28, 30, 35-36, 38-39, and 41, but does challenge

---

[29] Exemption 3 permits Defendant to withhold those documents that are "specifically exempted from disclosure by statute." 5 U.S.C. § 552(b)(3).

[30] 26 U.S.C. § 6103(a) mandates that tax returns and return information be kept confidential.

the withholding in full of pages 697-826.

These same 129 pages have also been withheld under FOIA Exemption 5, the deliberative process privilege.  As the Court finds in the next section of this Order that these pages were properly withheld under Exemption 5 *infra*, it is unnecessary to also evaluate their possible exemption under Exemption 3.

## C.    FOIA Exemption 5 (Deliberative Process Privilege)

Exemption 5 protects "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency."  5 U.S.C. § 552(b)(5).  This provision shields those documents, and only those documents, normally privileged in the civil discovery context.  *National Labor Relations Board v. Sears, Roebuck & Co.*, 421 U.S. 132, 149 (1975) ("*Sears, Roebuck & Co.*").  "Stated simply, '[a]gency documents which would not be obtainable by a private litigant in an action against the agency under normal discovery rules (*e.g.*, attorney-client, work product, executive privilege) are protected from disclosure under Exemption 5.'"  *Moye, O'Brien, O'Rourke, Hogan, & Pickert v. Nat'l R.R. Passenger Corp.*, 376 F.3d 1270, 1277 (11th Cir. 2004) ("*Nat'l R.R. Passenger Corp.*") citing *Grand Cent. P'ship, Inc. v. Cuomo*, 166 F.3d 473, 481 (2d Cir. 1999); *Enviro Tech Int'l, Inc. v. USEPA*, 371 F.3d 370, 374 (7th Cir. 2004) ("Conversely, if a private litigant could not obtain certain records from the agency in discovery, Exemption 5 relieves the agency of the obligation to produce that document to a member of the public.").

"To fall within the deliberative process privilege, a document must be <u>both</u> '<u>predecisional</u>' and '<u>deliberative</u>.'"  *Nat'l R.R. Passenger Corp.*, 376 F.3d at 1277 (citation omitted, emphasis added); *Department of Interior v. Klamath Water Users*

*Protective Ass'n*, 532 U.S. 1, 8 (2001).

To be <u>predecisional</u>, information must be "prepared in order to assist an agency decision-maker in arriving at his decision."  Therefore, by definition, predecisional information must be generated before the adoption of an agency policy, and "the record must bear on the formulation or exercise of policy-oriented judgment."  *Nat'l R.R. Passenger Corp.*, 376 F.3d at 1277-78.  It may "include recommendations, draft documents . . . and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency."  *Id.* at 1277, citing *Florida House of Rep. v. U.S. Dep't of Commerce*, 961 F.2d 941, 945 (11th Cir. 1992) ("*Florida House*").

A document is considered <u>deliberative</u>, if it makes recommendations or expresses opinions on legal or policy matters.  *Broward Bulldog*, 939 F.3d at 1195 citing *Miccosukee Tribe*, 516 F.3d at 1263.  In the Eleventh Circuit, "[t]he only inquiry that should be made in deciding whether something should be denoted opinion, and hence deliberative, is:  Does the information reflect the give-and-take of the consultive process?"  *Florida House*, 961 F.2d at 949 citing *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980) ("*Coastal States*"); *see also Sears, Roesbuck & Co.*, 421 U.S. at 150 (courts should "focus on documents 'reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated.'").

"The underlying purpose of the deliberative process privilege is to ensure that agencies are not forced to operate in a fish bowl. . . .  Therefore, courts must focus on the effect of the material's release."  *Nat'l R.R. Passenger Corp.*, 376 F.3d at 1278

(citations omitted).  The exemption thus covers recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency.  Documents which are protected by the privilege are those which would inaccurately reflect or prematurely disclose the views of the agency, suggesting as agency position that which is as yet only a personal position.  To test whether disclosure of a document is likely to adversely affect the purposes of the privilege, courts ask themselves whether the document is so candid or personal in nature that public disclosure is likely in the future to stifle honest and frank communication within the agency.  *Coastal States*, 617 F.2d at 866.

"Human experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decisionmaking process."  *Coastal States*, 617 F.2d at 866 citing *United States v. Nixon,* 418 U.S. 683, 705 (1974); *Broward Bulldog,* 939 F.3d at 1194 (the deliberative process privilege is designed both to minimize public confusion about agency rationales and actions and "to allow agencies to freely explore possibilities, engage in internal debates, or play devil's advocate without fear of public scrutiny.").  It is said that case law in this area are of limited help because the deliberative process privilege is so dependent upon the individual document and the role it plays in the administrative process.  *Coastal States*, 617 F.2d at 866.

"The privilege that has been held to attach to intragovernmental memoranda does, however, have finite limits, and one of these limits is that memoranda consisting only of compiled factual material or purely factual material contained in

deliberative memoranda but severable from its context is generally available for discovery by private parties in litigation with the government.  Exemption 5, therefore, 'requires different treatment for materials reflecting deliberative or policy-making processes on the one hand, and purely factual, investigative matters on the other.'" *Pacific Molasses Co. v. N. L. R. B. Regional Office # 15*, 577 F.2d 1172, 1183 (5th Cir. 1978) (citation omitted).

In 2016, the President signed into law the FOIA Improvement Act of 2016, Pub. L. No. 114-185, 130 Stat. 538.  Among other things, the Act codified the "foreseeable harm" standard and creates additional administrative review processes that allow requesters to challenge initial agency decisions to withhold requested records.  It provides that

• Agencies "shall withhold information" under the FOIA "only if the agency reasonably foresees that disclosure would harm an interest protected by an exemption" or "disclosure is prohibited by law."

• Agencies shall "consider whether partial disclosure of information is possible whenever the agency determines that a full disclosure of a requested record is not possible."

• Agencies shall "take reasonable steps necessary to segregate and release nonexempt information."

• This provision does not require disclosure of information "that is otherwise prohibited from disclosure by law, or otherwise exempted from disclosure under [Exemption] 3."  Cornish F. Hitchcock, 2 Guidebook to the Freedom of Information and Privacy Acts, Appendix L (2019).

In sum, FOIA now requires that an agency "release a record — even if it falls within a FOIA exemption — if releasing the record would not reasonably harm an exemption-protected interest and if its disclosure is not prohibited by law." *Investigative Reporting*, 436 F. Supp. 3d at 106, quoting *Judicial Watch, Inc. v. U.S. Dep't of Justice* ("*Judicial Watch II*"), No. 17-cv-0832 (CKK), 2019 WL 4644029, at *3 (D.D.C. Sept. 24, 2019) (internal quotation mark omitted).

Consistent with Congress's concern about agencies' over-withholding pursuant to Exemption 5, most of the decisions that have addressed the foreseeable-harm requirement have done so when considering the Exemption 5 deliberative-process privilege. Three key principles may be gleaned from those decisions, which though non-binding, are persuasive as guiding application of the foreseeable-harm requirement. *Investigative Reporting*, 436 F. Supp. 3d at 106.

First and foremost, the foreseeable-harm requirement "impose[s] an independent and meaningful burden on agencies." *NRDC v. EPA,* No. 17-CV-5928 (JMF), 2019 WL 3338266, at *1 (S.D.N.Y. July 25, 2019); *see also, e.g.*, *Judicial Watch, Inc. v. U.S. Dep't of Commerce*, 375 F. Supp. 3d 93, 100 (D.D.C. 2019) (describing the new foreseeable-harm requirement as a "heightened standard"). Indeed, as the foregoing legislative history illustrates, the text, history, and purpose of the FOIA Improvement Act confirm that the foreseeable-harm requirement was intended to restrict agencies' discretion in withholding documents under FOIA. *See Stone v. INS,* 514 U.S. 386, 397 (1995) ("When Congress acts to amend a statute, we presume it intends its amendment to have real and substantial effect.").

Second, to meet this independent and meaningful burden, an agency must "identify specific harms to the relevant protected interests that it can reasonably foresee would actually ensue from disclosure of the withheld materials" and "connect[ ] the harms in [a] meaningful way to the information withheld." *Judicial Watch II,* 2019 WL 4644029, at *5; *see* H.R. Rep. No. 114-391, at 9 ("An inquiry into whether an agency has reasonably foreseen a specific, identifiable harm that would be caused by a disclosure would require the ability to articulate both the nature of the harm and the link between the specified harm and specific information contained in the material withheld.").

Third and finally, agencies "may take a categorical approach" and "group together like records," *Rosenberg*, 342 F. Supp. 3d at 78,  When using a categorical approach, however, an agency must provide more than "nearly identical boilerplate statements" and "generic and nebulous articulations of harm," *Judicial Watch II*, 2019 WL 4644029, at *4–5.

The IRS withheld nine pages in part and 130 pages in full under FOIA Exemption 5 in conjunction with the deliberative process privilege.  The information withheld in part is located on pages 2-3, 21-22, and 25-27 and the pages withheld in full are pages 29, 43, and 697-826.  *See* DE 48 (under seal).  The IRS asserts the information in these records reflects opinions and recommendations of agency personnel that preceded the final issuance of PLR-147816-13.  DE 20-1, ¶ 42.

The IRS states all of the withheld records were drafted, written, or compiled by IRS employees or Office of Chief Counsel attorneys and were created primarily for intra-agency use by the IRS.  DE 20-1, ¶ 40.  The IRS claims these documents reflect

Page **39** of **53**

the deliberations of IRS employees and Office of Chief Counsel attorneys regarding the processing, drafting, and issuance of PLR-147816-13.  DE 20-1, ¶ 39.  The IRS further asserts all of the records withheld under FOIA Exemption 5 discuss or propose options for reaching the proper legal determination with respect to the PLR, or provide suggested revisions, legal analysis, and other comments on the language of the draft versions of the PLR and various other intra-agency communications involved in the PLR decision-making process.  *Id.* ¶ 28.

Scott lodges a number of specific challenges to the withheld documents.

**1. Pages Withheld in Part Under FOIA Exemption 5**

Nine pages were withheld in part under Exemption 5 in conjunction with the deliberative process privilege:  pages 2-3, 21-22,[31] and 25-27.

Regarding page 3, Scott points to a telephone and work log that deletes entries related to a telephone conversation with the representative for the PLR requester, an external party, and notes of a meeting with Lon Smith, national counsel (special projects) reporting directly to the Chief Counsel, who Scott maintains was outside the decision-making process pursuant to the organization's chart.  DE 45 at 18-19 (redacted page at 29-3 at 3).[32]  Scott doubts whether these events played any role in the decision about the PLR and asserts that telephone calls with a party outside the IRS "either fail the requirement to be fully inter- or intra-agency records, fail to be deliberative in that they do not contain opinions or recommendations, or were

---

31  Scott did not object to pages 21-22 being withheld in part under Exemption 6, but does object to those portions on pages 21-22 being withheld under Exemption 5.

32  Some of the withheld information on this particular page consists of the name and other identifying return information of a third party taxpayer, which is correctly omitted.  *See* Vaughn Index, Exemption (b)(3) in conjunction with I.R.C. § 6103(a).

disclosed to the outside party and lose any privilege."  DE 45 at 23.

The Court has reviewed the redactions made on pages 2-3 *in camera* and finds

that the withheld sections include both deliberative material and taxpayer

representative information.  *See* DE 48 (under seal).  Therefore, Scott's challenge to

the redactions made on pages 2-3 is rejected.

Regarding pages 21-22 withheld in part, Scott asserts

> The redaction [at the top of page 21] (DE 29-3, p. 5) lacks any evidence of deliberative nature, of "personal opinion" or recommendation, contrary to the claim in the Vaughn Index.  It directs the forwarding of an email.  With respect to the redactions at the bottom of page 21 and page 22 (DE 29-3 pp. 5-6), those appear to present a factual report regarding examinations of abusive TRS transactions by TEB (the Tax-Exempt Bond group in TE/GE as it existed at that time), which is of course a separate matter.  If so, the report would comprise facts with respect to those other examinations.  Thus it also fails the test as to its deliberative nature, lacking actual opinion or recommendation about the PLR itself.

DE 45 at 23 (emphasis provided).

The Court has carefully reviewed pages 21-22 *in camera* and has determined

that the sentence redacted at the top of page 21 (after the first few lines which are

properly redacted under Exemption 6[33]) asks the recipient to forward a submission to

certain branches.  This sentence does not fall within the parameters of what case law

has established as properly withheld under the deliberative process and should be

released.  It does not reflect an advisory opinion, recommendation or deliberation

comprising part of a process by which governmental decisions and policies are

formulated.  The effect of its release would not inaccurately reflect or prematurely

---

[33] Exemption 6 permits an agency to withhold "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(6).

disclose the views of the agency, or suggest as agency position that which is as yet only a personal position.

On the other hand, the redaction at the bottom of page 21 and top of page 22 is exactly the type of advisory opinion that the deliberative process was intended to protect. The redacted notes reflect the give-and-take of the consultive process and were properly withheld in part. *See*, *Florida House*, 961 F.2d at 949.

Accordingly, Scott's objection to the one sentence redaction made pursuant to Exemption 5 near the top of page 21 is sustained and the IRS is directed to rerelease page 21 with that sentence intact. Scott's objection to the withholding of the bottom of page 21 and the top of page 22 is denied.

Regarding pages 25-27 withheld in part, Scott asserts

In this matter there is another important date to consider, namely the inception of the matter. The PLR request was dated November 19, 2013 (DE 29-2, p.3), the User Fee was receipted on November 21, 2013 (DE 29-3, p.5), and the Case History Form shows that the matter was assigned to the drafting attorney, Lewis Bell, and the Senior (reviewing) Attorney, Timothy Jones, on November 21, 2013 (Form 9719: DE 29-3, p. 2). There is a document that indicates a conference call on November 4, 2013, presumably for a "pre-submission conference". DE 29-3, p. 8. The Techmis General Case Detail status report as of 12/3/2013 shows "0" hours accumulated on this matter as of that date. Plaintiff's SUMF ¶ 56.b; DE 29-3, p.4. As a threshold matter, no document prior to the submission of the request and the identification of the decision-maker can be said to meet the standard of *Grumman* as "being prepared to assist the agency decision-maker," as the actual questions have yet to be framed and the decision-maker is unknown. Thus the redactions based on Exemption (b)(5) on pages 25-27 (DE 29-3, pp. 9-11), which are emails dated October 21, 2013, August 5, 2013, August 5, 2013, and September 19, 2013, cannot be pre-decisional. *See also* Vaughn Index pp. 2-3.

The August 5, 2013 emails between Attorney Jones and another IRS employee, Allyson Belsome, [on page 25-26] about an article in a trade newspaper (the "Bond Buyer"), cannot be connected at all at that

> time to the PLR that does not yet exist. Vaughn lndex p. 2. The email from Attorney Jones straightforwardly asks about the article and the transaction described therein, and the reply was presumably on point. Ms. Belsome could not have been offering an opinion or a recommendation about the PLR that did not yet exist and about which she could not be aware. One would reasonably expect her reply to be fact-based and directed to the article topic.  While the September 19 and October 21 emails reference a pre-submission conference, there is no evidence that those records were "prepared to assist the agency decision-maker" (as the emails are FROM the party that later became the decision-maker), or that they offer an opinion or a recommendation.  Other records that pre-date the submission of the actual PLR request should also be summarily excluded from the claim of Exemption 5, as they cannot contain opinions or recommendations about questions that are not yet posed.

DE 45 at 19-20, also at 23 (emphasis provided).

The redacted information on pages 25-26 references an attachment, which is not included, and reviews a story in The Bond Buyer.  The IRS allowed the following words to be viewed, "[t]he story suggests" but then redacted the writer's description of the published story.  The writer then requests "more information about these deals."  This email string does not reflect an advisory opinion, recommendation or deliberation comprising part of a process by which governmental decisions and policies are formulated.  The effect of its release would not inaccurately reflect or prematurely disclose the views of the agency, or suggest as agency position that which is as yet only a personal position.  Moreover, the IRS has not identified specific harm to the relevant protected interests that it can reasonably foresee would ensue from disclosure of the redacted portion of the email.

Accordingly, Scott's objection to the redactions on pages 25-26 are sustained and the IRS is directed to release all information on pages 25-26 that it claimed was deliberative.  The one redaction of the name of a taxpayer representative on the first

line on page 25 is upheld as properly falling within the exemption.  *See* DE 48 (under seal).

One and one-half of a sentence on page 27 has been redacted under the deliberative process exemption.  Having reviewed the redacted matter *in camera*, the Court finds this information was properly redacted under the deliberative process privilege.  Scott's challenge to this redaction is therefore denied.

2.     **The unsigned drafts of the PLR**

According to the Vaughn Index, pages 736-816 consist of drafts of the PLR, some undated, others dated 5/7/14, 5/13/14, 5/19/14 and 5/20/14.  Scott argues that the drafts of the PLR dated from 5/7/14 to 5/20/14 (pages 736-816, Vaughn Index at 5-6) cannot be predecisional or deliberative because the IRS had already reached its final decision prior to the date of issuance of the final PLR on May 21, 2014, and any edits on those drafts must consist merely of "wordsmithing."  He further notes that each draft is attributed to Lewis Bell as the author.  "[M]ultiple drafts by the same person indicate worthsmithing, not deliberative 'give and take' with others."  DE 45 at 17-18.

"Draft documents, by their very nature, are typically predecisional and deliberative.  They 'reflect only the tentative view of their authors; views that might be altered or rejected upon further deliberation either by their authors or by superiors.'"  *Exxon Corp. v. Dep't of Energy*, 585 F.Supp. 690, 698 (D.D.C. 1983) quoting *Pennzoil v. Dep't of Energy*, 4 Energy Mgt. (CCH) ¶ 26,340, at 28,606–07 (D. Del. 1981).  Nonetheless, "an agency cannot withhold . . . material merely by stating that it is in a draft document."  *Dudman Comm'ns Corp. v. Dep't of Air Force*, 815

F.2d 1565, 1569 (D.C. Cir. 1987) ("*Dudman*"); *see also Judicial Watch, Inc. v. U.S. Postal Serv.*, 297 F. Supp. 2d 252, 261 (D.D.C. 2004).

Courts consistently hold that the only date relevant to determining whether a record is predecisional is the date that the decision was made. *See, e.g., Abtew v. DHS*, 808 F.3d 895, 898 (D.C. Cir. 2015) ("A document is 'predecisional' if it precedes, in temporal sequence, the 'decision' to which it relates." (internal quotations and citations omitted)); *Hall & Assoc. LLC v. EPA*, 315 F. Supp. 3d 519, 534 (D.D.C. 2018)[34] ("[T]he predecisional analysis examines *when* the agency created a given record in relation to the timing of the decision to which the record relates . . . ." (emphasis in original)); *Judicial Watch, Inc. v. U.S. Dep't of Justice*, 20 F. Supp. 3d 260, 269 (D.D.C. 2014) ("[C]ourts determine whether a document is predecisional by looking at the timing of the document's release relative to the date the decision was made.").

Having reviewed all the documents *in camera*, disclosure of the PLR drafts in this case would divulge information regarding "decisions to insert or delete material or to change [the] draft's focus or emphasis" and thus "would stifle the creative thinking and candid exchange of ideas necessary to produce good ... work," *Dudman*, 815 F.2d at 1569 (exempting drafts of official Air Force histories); *see also Russell v. Dep't of Air Force,* 682 F.2d 1045, 1048–49 (D.C. Cir. 1982) (same); *Hardy v. Bureau*

---

34 *Rev'd on other grounds*.  See *Hall & Associates v. Environmental Protection Agency*, 956 F.3d 621 (D.C. Cir. 2020) ("The critical question is only one of timing: Whether the EPA, as a matter of law, carried its burden of establishing that its nonacquiescence decision was reached only after all of the documents at issue here were created. *See Assassination Archives & Research Ctr. v. CIA,* 334 F.3d 55, 57 (D.C. Cir. 2003) (The agency "bears the burden of establishing the applicability of [a] claimed [FOIA] exemption."); *see also* 5 U.S.C. § 552(a)(4)(B) ("[T]he burden is on the agency to sustain its action."). That factual question of timing is material—actually, dispositive—in deciding (i) which of the EPA documents that Hall seeks were created prior to the EPA's nonacquiescence decision, and so satisfy the first requirement for withholding under the deliberative process privilege, and (ii) which were generated after the decision was made, and so cannot be withheld under that privilege."

*of Alcohol, Tobacco, Firearms & Explosives*, 243 F. Supp. 3d 155, 173-74 (D.D.C. 2017)

("*Hardy*") (stating that draft documents are usually considered deliberative).

Here, the IRS asserts the unsigned drafts include "proposed actions, mental

impressions, analysis, opinions, advice, and recommendations." Vaughn Index, DE 41-

2. Many of the drafts at issue include handwritten notes, tracked changes,

comments, and other edits. *Id. See also Hall & Associates LLC v. U.S. Environ.*

*Protection Agency*, 315 F. Supp. 3d 519, 538 (D.D.C. 2018) (explaining that documents

containing comments, editing marks, and incomplete lists support the claim that

documents are drafts and therefore deliberative). Courts regularly hold that drafts,

such as these, which "contain numerous edits, comments, and suggested changes

reflecting intra-agency recommendations, analyses, opinions, and other non-factual

information" are deliberative. *See, e.g., Nat'l R.R. Passenger Corp.*, 376 F.3d at 1279

(holding that drafts containing the comments and notes authored by all levels of

auditors were deliberative); *Georgia Aquarium, Inc. v. Pritzker*, 134 F. Supp. 3d 1374,

1379 (N.D. Ga. 2014) ("*Georgia Aquarium*") ("Documents such as 'recommendations

[and] draft documents . . . . which reflect the personal opinions of the writer rather

than the policy of the agency' are considered deliberative") quoting *Am. Petroleum*

*Tankers Parent, LLC v. United States*, 952 F. Supp. 2d 252, 265-66 (D.D.C. 2013).

Not only would disclosure of these drafts disclose the IRS's decisions to insert or

delete material to change the draft's focus or emphasis, but it would also inhibit frank

discussions and stifle the decision-making process. *See Georgia Aquarium*, 134 F.

Supp. 3d at 1379. Specifically, the release of these materials could demonstrate the

alterations that the agency decided to make, which could result in authors

Page **46** of **53**

"hesitat[ing] to advance unorthodox approaches if [they] knew that [the agency's] rejection of an approach could become public knowledge." *Dudman*, 815 F.2d at 1569; *see also Hardy*, 243 F. Supp. 3d at 174 (holding that disclosure of a draft document would disclose an agency's decisions to insert or delete material or to change the draft's focus or emphasis, which could "stifle the creative thinking and candid exchange of ideas necessary to produce good work"). Thus, even if these drafts include editorial changes or "wordsmithing," disclosure could still stifle creative thinking and the candid exchange of ideas necessary to produce good work. *See Dudman*, 815 F.2d at 1569.

Scott does not dispute that the final PLR was dated May 21, 2014. As a result, the final decision date for the predecisional analysis is May 21, 2014. The Court has reviewed *in camera* the PLR drafts at pages 736-816 dated from May 7, 2014 to May 20, 2014 and finds they have been properly withheld as predicisional and deliberative and any meaningful segregation of non-exempt information is not possible.

**3.    Factual vs. Deliberative Material**

Scott suggests that the withheld records contain factual information as opposed to deliberative information. Scott asserts that "any notes consisting of research on the existing Internal Revenue Code provisions, existing regulations thereunder, and the legislative history, and even examinations by other units are all factual materials, not deliberative, and not subject to Exemption 5." DE 45 at 24-25. Scott also argues that the withheld information cannot be deliberative because if the IRS fails to consider "a relevant fact, statute, or Regulation," this constitutes an error, and not an editorial judgment. DE 45 at 16.

Analysis and evaluation of the law as it applies to the given facts is not factual material.  Rather, this is precisely the information that the deliberative process privilege is intended to protect.  *See Skelton v. U.S. Postal Serv.*, 678 F.2d 35, 38 (5th Cir. 1982) ("[T]his court and others have recognized that analysis and evaluation of facts are as much a part of the deliberative process as analysis and evaluation of law.").

Further, Scott appears to argue that all factual material is *per se* not deliberative.  DE 45 at 15.  This is incorrect as a matter of law.  Factual material may be deliberative "where disclosure of the factual material would reveal the deliberative process or where the factual material is so inextricably intertwined with the deliberative material that meaningful segregation is not possible." *Miccosukee Tribe*, 516 F.3d at 1263; *Mead Data Central, Inc. v. Dep't of Air Force*, 566 F.2d 242, 256 (D.C. Cir. 1977) ("*Mead Data Central*") ("In some circumstances, however, the disclosure of even purely factual material may so expose the deliberative process within an agency that it must be deemed exempted by section 552(b)(5).").  This is because the deliberative process privilege is intended to "protect the deliberative process of government and not just deliberative material." *Mead Data Cent*ral, 566 F.2d at 256.  As a result, whether the deliberative process applies is "dependent upon the individual document and the role it plays in the administrative process." *Hardy*, 243 F. Supp. 3d at 168.  Courts tend to "focus less on the nature of the materials sought and more on the effect of the materials' release." *Dudman,* 815 F.2d at 1568.

The information at issue here discusses or proposes options for reaching the correct legal determination with respect to the PLR, or provides suggested revisions,

legal analysis, and other comments on the language of draft versions of the PLR and other intra-agency communications involved in the PLR decision-making process. (Edelman Decl. ¶ 28; Vaughn Index.)  The information at issue, therefore is either not factual or is so inextricably intertwined with the deliberative material that it cannot be segregated.[35]

4.   **Drafts That May Have Been Incorporated into the Final PLR**

Scott next argues that even if the drafts contain deliberative material, they are no longer deliberative to the extent the draft was incorporated into the final PLR.  DE 45 at 18, 20, 27.  The IRS responds by asserting a record can only lose its privilege if the agency "has chosen to expressly adopt it or incorporate it by reference into an otherwise final opinion." *Hawkins v. Dep't of Labor*, No. 305CV269J32TEM, 2005 WL 2063811, at *4 (M.D. Fla. Aug. 19, 2005).  For example, in *National Counsel of La Raza v. U.S. Dep't of Justice,* the Second Circuit determined that an agency waived the deliberative process privilege where it publicly and repeatedly referenced the memorandum as justification for a particular policy.  411 F. 3d 350, 359 (2d Cir. 2005).

Thus, in order to succeed on this argument, Scott must point to specific information that was adopted or incorporated by reference into the final PLR.  *See id.* at 359 ("[T]here must be evidence that an agency has *actually* adopted or

---

[35]  Further, it is important to note that much of the information that is withheld under FOIA Exemption 5 in conjunction with the deliberative process privilege, is also being withheld under FOIA Exemption 3 in conjunction with 26 U.S.C. § 6103. (Edelman Decl. ¶ 28; Vaughn Index.)  As a result, to the extent the withheld information contains any factual return information, that information is also exempt from disclosure under FOIA Exemption 3.

incorporated by reference the document at issue; mere speculation will not suffice." (emphasis in original)); *Hawkins*, 2005 WL 2063811, at *4 ("Without clear adoption or incorporation by [the agency], the [withheld information] did not lose its privilege.").

There is no evidence that the IRS has expressly adopted the withheld information by reference into the final PLR.  DE 45 at 18, 20, 27.  Scott merely speculates that unidentified parts of the drafts and comments included in those drafts have been incorporated into the final draft of the PLR.  DE 45 at 18, 20.  This speculation is not sufficient to demonstrate that the IRS expressly adopted or incorporated the drafts by reference.  *See National Counsel of La Raza*, 411 F. 3d at 359.

**5.     Waiver of the Deliberative Process Privilege**

Scott states that "the OCC decided that it would not accede to the [PLR requester's] original request to rule favorably on "no reissuance" and communicated that to the PLR requester. . .  and the requester formally withdrew that portion of the request by letter dated May 9, 2014.  ("This letter confirms that the applicants withdraw their request that the Service rule on the reissuance question. . . We request that the conclusions of the ruling be silent on this issue.")  DE 45 at 26-27. Scott asserts that "material that explains the decision not to rule favorably represents a 'final opinion' made in the adjudication of a case and fall[s] outside the scope of Exemption 5."  *Sears, Roebuck & Co.*, 421 U.S. at 147-48 ("Advice and Appeals Memoranda which explain decisions by the General Counsel not to file a complaint are 'final opinions' made in the adjudication of a case and fall outside the scope of Exemption 5").  Scott further asserts that "[i]t is impossible to identify which notes,

etc. among the withheld records pertain to this topic.  The actual communications are undocumented, contrary to policy, so one may assume that any material on this topic has been shared with a party outside the IRS.  Material voluntarily disclosed to an outside party loses any privilege." DE 45 at 27, *see also* DE 45 at 23.

Scott has failed to demonstrate that the IRS waived the deliberative process privilege.  Scott cannot identify which records he is asserting have been disclosed and to whom these records have allegedly been disclosed.  Scott's assumption that the material was voluntarily disclosed is not sufficient evidence to demonstrate that the IRS waived the deliberative process privilege.  *See Electronic Frontier Found.*, 890 F. Supp. 2d at 47 (rejecting unsubstantiated, speculative claims that the withheld records had been previously revealed).

**6.     Whether the IRS reasonably foresees that disclosure of the withheld information would harm an interest protected by FOIA Exemption 5.**

Finally, Scott argues that the IRS has failed to meet its burden that it reasonably foresees that disclosure would harm any interest protected by FOIA Exemption 5 in conjunction with the deliberative process privilege.  DE 45 at 23-5.

The IRS has clearly set forth the manners in which it reasonably foresees the harm that disclosure of the withheld information could cause.  Specifically, the IRS explained in its Motion for Summary Judgment that disclosure of the withheld information would expose the decision-making process and discourage candid discussions within the agency.  DE 20-2 at 9-10.  Further, as explained above, because many of the withheld records include handwritten notes, tracked changes, comments, and other edits, disclosure of this information would disclose the IRS's decisions to

insert or delete material in order to change the drafts' focus or emphasis.  *See Georgia Aquarium*, 134 F. Supp. 3d at 1379.  Many courts agree that the release of such information could result in authors "hesitat[ing] to advance unorthodox approaches if [they] knew that [the agency's] rejection of an approach could become public knowledge." *Dudman*, 815 F.2d at 1569; *see also Hardy*, 243 F. Supp. 3d at 174 (holding that disclosure of a draft document would disclose an agency's decisions to insert or delete material or to change the draft's focus or emphasis, which could "stifle the creative thinking and candid exchange of ideas necessary to produce good work").  As such, the disclosure of this information would "stifle the creative thinking and candid exchange of ideas." *See Dudman*, 815 F.2d at 1569.  Thus, claiming the exemption helps protect the IRS from the inhibition of "frank discussion of legal or policy matters." *Sears, Roebuck & Co.,* 421 U.S. at 150.

Scott appears to argue that there can be no harm to the deliberative process where the PLR determination was made many years ago in a private process.  DE 45 at 24-5.  This argument misses the point.  While the PLR process may be finalized as to this specific PLR, if the Court were to rule that this type of information is not protected from disclosure, then it might impact all PLR processes.  As set forth above, drafting authors would be much more hesitant with their notes and drafts if they were aware that their work could become public knowledge. *See Dudman*, 815 F.2d at 1569; *see also Hardy*, 243 F. Supp. 3d at 174.  As such, the assertion of the privilege is not just to protect a finalized PLR process, it is to protect the "frank discussion of legal or policy matters." *See Sears, Roebuck & Co.*, 421 U.S. at 150.

**Conclusion**

For the reasons elaborated upon above, it is hereby

**ORDERED AND ADJUDGED** that the Internal Revenue Service's Motion for

Summary Judgment [DE 20] is granted in part and denied in part; and Plaintiff's Cross-

Motion for Summary Judgment [DE 25] is granted in part and denied in part.

**DONE AND ORDERED** in Chambers at West Palm Beach, Palm Beach County,

Florida, this 26th day of January, 2021.

KENNETH A. MARRA
United States District Judge